**EVANS et ux. v. HOUSTON OIL CO. OF TEXAS et al.  (No. 224–3391.)**

(Commission of Appeals of Texas, Section A. June 8, 1921.)

**1. Adverse possession** ⬅️60(2)—**Possession with owner's permission not adverse possession.**

Occupancy of land by one who entered thereon by permission of the owner did not give occupant title by adverse possession, since the possession in such case was that of the owner.

**2. Adverse possession** ⬅️47—**Owner's entry on land to cut timber broke continuity of adverse claimant's possession except as to land inclosed by claimant.**

Owner's entry upon land to cut timber therefrom interrupted the running of the statute of limitations in favor of adverse claimant as to all of such land except that portion inclosed by claimant, since owner's entry on land carried with it constructive possession of all the land not in claimant's actual possession.

**3. Adverse possession** ⬅️50—**Purchase of other land three-quarters of a mile distant from land occupied did not preclude purchaser from obtaining title to land occupied by adverse possession.**

Adverse claimant in possession of land claimed did not by purchase from owner thereof of another tract of land three-quarters of a mile distant from land so occupied and claimed acknowledge owner's title to the land so occupied so as to preclude him from obtaining title thereto by adverse possession, but such purchase was merely a circumstance for the jury to consider in connection with other facts and circumstances in evidence in determining whether the adverse claimant's possession was adverse during a continuous period of 10 years at any one time.

**4. Adverse possession** ⬅️115(1)—**Whether plaintiff's possession of land was adverse held for jury.**

Whether plaintiff, claiming to have acquired title by adverse possession, had actual, continuous, adverse possession for a period of 10 years, *held* for the jury.

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Suit by Jubal Evans and wife against the Houston Oil Company of Texas and others. Judgment for defendants affirmed by the Court of Civil Appeals (211 S. W. 605), and plaintiffs bring error. Judgments of district court and Court of Civil Appeals reversed, and cause remanded, with directions.

Coleman & Lowe, of Woodville, for plaintiffs in error.

Kennerly, Williams, Lee & Hill, of Houston, H. O. Head, of Sherman, and P. O. Settle, of Houston, for defendants in error.

GALLAGHER, J. Jubal Evans and wife, plaintiffs in error, sued the Houston Oil Company of Texas and others, defendants in error, for an undivided 160 acres of the W. S. Brown survey in Tyler county to be surveyed so as to include their improvements, claiming that they had acquired title thereto under the 10-year statute of limitation.

It was agreed that the defendants in error owned the land sued for unless plaintiffs in error had acquired title thereto under the 10-year statute. A trial was had before a jury. The court instructed a verdict in favor of defendants in error and judgment was so rendered.

The Court of Civil Appeals, by divided court, affirmed such judgment. 211 S. W. 605.

The survey in question contains 960 acres and is oblong in shape, being nearly two miles long from east to west.

Jubal Evans was the principal witness, and his testimony on direct examination is in substance as follows:

He moved on that survey in June, 1887, and lived on it with his family 16 or 17 years, leaving it in 1903 or 1904. He lived on the east end or east corner of the survey. He did not own any land on the survey at the time he moved onto it, but he afterwards purchased 160 acres where he lived, which tract was totally in the pine woods.

He had other improvements on said survey besides his home. He had a field of 12 or 15 acres down on the creek about three-fourths of a mile from his home place. He claimed 160 acres around that field and down to the creek to be surveyed so as to include the field. He hired 3 acres of this land cleared in the summer of 1887. He cleared and put into cultivation 5 acres the first year, and he put the entire field in cultivation the second year. He cultivated the land embraced in that field every year from 1887 to 1903, and he claimed 160 acres of that land each and every year while he stayed there and has claimed it ever since he left.

Evans was then taken on cross-examination and testified in substance:

A. F. Hester was on said survey logging

and running timber down the creek to the Reliance Lumber Company. Hester moved up there in 1887 and built a camp house on said survey and told him to take charge of it, and he did so and boarded Hester's men. Evans did not intend to stay there at first, but he kept on living there with his family. After about one year Hester pulled up and left and went to logging three or four miles away. He wanted Evans to go with him, but Evans declined, and said he would just stay where he was and cultivate his field and go to and fro to his work with Hester. When Hester built this little house and had Evans move into it he was running the camp for the Reliance Lumber Company and was its woods foreman, working the timber on this survey and running it down to them. He was really a contractor, cutting the timber and running it down and selling it for so much a thousand for the Reliance Lumber Company, which Company then owned the land.

The Reliance Lumber Company, by deed dated September 9, 1893, conveyed to Evans by metes and bounds 160 acres of land out of the northeast part of the survey, reserving the timber thereon. The purchase came about in this way: Hester, one day, in casual conversation with Evans, suggested that maybe he could buy the land he lived on at that time, and said he would see the Reliance Lumber Company. Evans expressed the hope that he could get a place to live on and put his house on.

Hester was agent for the Reliance Lumber Company and attended to their business. Hester procured the deed and delivered it to Evans and carried him for the purchase money, which was paid by Evans in work for Hester. Evans pointed out to Hester the exact land he wanted, so it would cover his house and little field near the house, and the tract purchased was so surveyed. The tract purchased was out in the open pine woods and a more desirable place to live. Evans talked the matter over with his wife, and she favored getting the land to live on, saying she did not want to go down in the creek bottom to live, but that he could still cultivate his field down there.

The Reliance Lumber Company conveyed the land to the Village Mills Company, and said company, on the 9th day of April, 1901, released the timber rights reserved by the Reliance Lumber Company when it conveyed the land to Evans.

The Village Mills Company entered this survey and cut the timber off of the same in 1900 and 1901, but they did not cut any timber off the 160 acres surrounding Evans' field, which he was claiming at the time.

While the Village Mills Company was cutting the timber off this survey, Evans sold them some cordwood. He had deadened the timber in the spring, and he cut it in the fall and sold it to them for $1.15 per cord, which was about the value of the work in getting it out, but it was on the land, and Evans wanted to dispose of it. Evans did not know whether the Village Mills people knew at the time that this wood was cut off the 160 acres he was claiming. It was agreed by the parties that this survey was patented land.

Evans, on re-examination, testified in substance:

Hester was a relative, and, when he testified on cross-examination that Hester was putting out timber for the Reliance Lumber Company, he meant that that company bought the timber. Hester put it out to the man who would give him the most money for it. He said he sold it to the Reliance Lumber Company. He was a timber contractor and picked out floating timber wherever he could find it, put it in the creek, and carried it by water to Beaumont to market. Hester was not concerned, so far as he knew, with this survey or any other survey in that country, further than getting such floating logs off of it as he could buy. He cut timber off of several surveys around there. It was a fact that in that day and time a fellow floating timber down the creek cut it most anywhere he wanted it. They paid mighty little attention to lines or to the owners.

Evans requested Hester to buy the land he did buy, and Hester was his agent and acted in that capacity in the purchase. Evans told Hester at the time that he claimed the 160 acres down on the creek, being the land here sued for.

Before Evans left the place in 1904 he took a part of the rails inclosing his field in the bottom and carried them to his home place and used them there, but he did not take all the rails away from the field. The reason for the taking of the rails was that Evans was crippled in the hand, and his boys were not old enough to work, and he could not get any one to split any rails for him.

Evans sold his 160-acre home place to Ben Best by deed dated July 24, 1905. He paid taxes on this tract, but never paid any taxes on the land involved in this suit.

A majority of the Court of Civil Appeals held that the undisputed testimony showed that plaintiffs in error entered and resided upon the land at the special instance and request of the owner, and that their entry thereon in 1887, and their subsequent occupancy thereof was permissive, and not adverse, and this holding is the basis of the first assignment submitted by plaintiffs in error.

The entry of Evans upon the land was, under the evidence, at Hester's instance and request, to serve the purpose of the owner and at a place already selected and partially prepared for his coming. He remained in possession of a tract of land embracing the original improvements, living thereon with

his family continuously until he purchased the same for a home in September, 1893. He never set up any claim to this tract so purchased, and never by word or act repudiated the title of the owner thereto.

The Supreme Court, in Word v. Drouthett, 44 Tex. 365, 369–370, discussing adverse possession under the 10-year statute of limitation, says:

"The possession must be exclusive, or, as it is generally expressed, it must be 'actual, continued, visible, notorious, distinct, and hostile.' 2 Smith's Lead. Cases, 561 et seq. It must neither be abandoned, yielded up, or held in subordination to, recognition of, or dependent upon the will or right of another. He who would claim by reason of his adverse possession must, as has been said, 'keep his flag flying.' 19 Penn. St. 265. His entry upon the land must be with intent to claim it as his own or hold it for himself; or his intention to do so, if conceived after going into possession for some other purpose, must be manifested by some open or visible act or declaration showing such purpose, in order to set the statute in motion in his favor."

[1] Clearly possession of the home place by plaintiffs in error from their entry upon the land until their purchase of the same was not adverse. Word v. Drouthett, supra; Carter v. La Grange, 60 Tex. 636–638; Udell v. Peak, 70 Tex. 547, 551, 7 S. W. 786.

Possession of the home tract by plaintiffs in error being by permission of the owner, such possession constituted in law actual possession of the same by the owner, and such possession carried therewith constructive possession of all the land claimed by Evans in this suit, except such, if any, as was in his actual adverse possession at that time.

[2] The Village Mills Company, the owner of said survey in 1900 and 1901, entered upon the same during said years and cut the timber thereon. This entry by the owner carried with it constructive possession of all the land claimed by Evans in this suit except such as was in his actual possession at that time. South Texas Development Co. v. Manning (Tex. Civ. App.) 177 S. W. 998, 1000 (writ refused).

Plaintiffs in error make no claim of possession by them of any part of the land sued for, except from the summer of 1887 to and including the year 1903. Upon the facts stated, it is clear that plaintiffs in error did not have adverse possession for 10 continuous years of any of the land sued for, unless their possession of the field of 12 or 15 acres was of that character.

This field was in the bottom, three-quarters of a mile away from the home place. It was in no way incidental to, nor related to, the purposes for which Hester induced Evans to move on to the land, and was in no way connected with the logging business Hester was carrying on. It seems Evans took pos-

session of the same without asking or securing permission of Hester or any one else. Part of it was cleared and put into cultivation in 1887 and the remainder the next year, and it was cultivated every year from then until and including the year 1903, and Evans claimed 160 acres of land, including such field, every year during such time, and still claimed the same at the time of trial.

The defendants in error contend that Evans by entering into an agreement with Hester as the agent of the Reliance Lumber Company, the owner of the land, for the purchase of the home tract of 160 acres, and by subsequently accepting a deed thereto in 1893, recognized and acknowledged the title of the owner and thereby defeated any claim of adverse holding of any part of the land sued for at or prior to that time. This contention is based on the theory that a claim by Evans of an undivided interest of 160 acres in the Brown survey under and by virtue of the 10-year statute was a claim of an interest running through the entire survey, and that the purchase of any part of such survey from the owner was in effect a purchase of a part of the land so claimed by Evans.

A similar question was before the Court of Civil Appeals for the First District in the case of Louisiana & Texas Lumber Co. v. Kennedy, 142 S. W. 989, 990. In that case Kennedy sued the lumber company for an undivided 160 acres of land out of a tract of 276 acres, claiming title thereto under the 10-year statute and asking that the particular land to which he claimed to be entitled be set off and designated by the court. He also claimed that the lumber company had cut timber off the land and asked judgment against it for 160/276 of the value of all the timber so cut. He recovered judgment on this claim in the district court, but the Court of Civil Appeals reversed that part of the judgment and rendered judgment for the lumber company, holding that, while the 160 acres to which Kennedy was entitled was undivided in the sense that its boundaries were not defined, it was located by his possession and improvements and embraced the same, and such land contiguous thereto as the court might designate, and set apart to him in final partition, and that when so designated such land would be considered his from the time his title was perfected, and that, if any timber was cut therefrom after title vested in him by virtue of said statute, he could have his appropriate action.

This field, claimed and cultivated by Evans, is described as three-quarters of a mile from the home place. Certainly no part thereof is embraced in such place, nor does it reasonably appear, were plaintiffs in error entitled to recover the entire undivided interest of 160 acres sued for, that a reasonable selection and designation of the same by the court,

or by commissioners of partition under its direction, so as to include such field, would necessarily, or even probably, include any part of the 160 acres so purchased.

[3] We therefore hold that such purchase did not prevent an adverse holding of the field in actual possession of Evans, but that such purchase was merely a circumstance which the jury were entitled to consider in connection with all the other facts and circumstances in evidence in determining whether Evans' possession of such field was adverse during a continuous period of 10 years at any one time.

[4] If, prior to his abandonment of this field in 1903 or 1904 Evans had at any time actual, continuous adverse possession of the same for a period of 10 years, he will be entitled to recover the same in this action, and whether his possession thereof was of such character is a question of fact for the determination of the jury in view of all the evidence which may be before them tending to illustrate and explain it. Word v. Drouthett, 44 Tex. 365, 370.

We recommend that the judgments of the district court and the Court of Civil Appeals be reversed, and the cause remanded to the district court for proceedings in accordance with this opinion.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the question discussed in its opinion.